J Supor & Son Trucking v. Employees of North Jersey Welfare Fund, No. 20-3286 Welcome, Counsel, and you may proceed whenever you like. Thank you, Your Honor. Good morning, Your Honors. My name is Otionbe Lovelace. I am Counsel for J Supor & Son Trucking & Rigging Company, Incorporated. I would like to request five minutes of rebuttal time. That's granted. Thank you, Your Honors. Today, the issue before the Court and presented for review is whether or not the lower court judgmentalty erred when it granted TENJ's, the Trucking Employees of North Jersey Welfare Fund's, summary judgment motion and ruled that J Supor, my client, is an employer that is required to submit its withdrawal liability dispute with the TENJ to arbitration pursuant to the Multi-Employer Pension Plan Amendments Act of 1980. This dispute arises out of a project that started in 2007. It was the American Dream Project at the time known as Xanadu. My client is a contractor that's worked in the New Jersey area for many years, many decades, actually, and employs truckers on a routine basis to complete its projects. It typically works with Local 11 to hire truckers. And the reason I bring this up is because in 2007, it signed on to work on the American Dream Project, and at that time, it was informed by representatives from Local 560 that it would need to sign a letter of assent. It would also need to employ Local 560 drivers on its projects in order for it to exceed the equities, but we're familiar with the facts. The difficulty here is you're asking us to create a statutory exception for employers who agree not to pay withdrawal liability, but what's the textual basis for that exemption? Is there any evidence in the text that would allow such an exemption? What the case law seems to flesh out from the other circuits is they've defined what it is to be an employer under the MPPAA. And as it's been defined by other circuits, it's when an employer makes any contributions to a fund or has an obligation to contribute to a pension fund, it then becomes an employer that is then required to submit its claims to arbitration. But what we're trying to say here is that the Third Circuit has yet to really rule on what an employer is, and we're saying in this nuanced situation, which is different, I'll argue, than some of the other cases that have been reviewed here before, that this is a situation where a trustee for the fund, a representative for the union, and the employer, all three parties were together in this because what we're saying is that Mr. Valder, who entered into this oral agreement, was a representative for the fund because he was a trustee. That's out on the board of the fund, and he was also the president of Local 560 at that time. You don't dispute that there was a requirement for a mandatory arbitration under the MPPAA? There is a requirement for that, for a mandatory arbitration of withdrawal liability claims, when the particular individuals being forced into arbitration are considered to be employers pursuant to the MPPAA. And what we're saying here is that this is a situation where, in this situation, where there was an agreement that they would not be obligated to have to pay. But does that mean, are you arguing that you are not an employer, or are you arguing you're an employer, but there's an exception because there was a side agreement? Well, I'm saying that we are, that we're saying that we're not an employer because of this side agreement that should have been examined a little further before summary judgment was granted. I'm a little surprised that you're focusing so much. The side agreement, as a matter of equity, makes a lot of sense, but I don't see any basis for saying if you could contract out of being an employer, then all kinds of employers would always elect not to pay, and that would undercut the statute. That's a really dangerous exception. I'm surprised you're not arguing that, you know, maybe the meaning of employer is just the person who directly employs someone, and you guys didn't directly employ them. You called on the union, and then they did it. So might the other circuits be wrong? I mean, is your argument the other circuits are wrong? It seems like I would love to go down that road, but I believe the courts have kind of, the various circuits, courts, and even district courts in New Jersey have kind of touched upon this issue to the extent that. . . We're not bound by the district courts. This is the first time we're going to be defining this. I understand, Your Honor. So we're given that opportunity. Do you have a problem with, I mean, I guess it all started with the Korea shipping case in Second Circuit, and I guess as you acknowledge, all the other circuits have gone along with that. Do you have a problem with that rule as a general matter, because we have to write an opinion, right? So what I'm trying to parse out between our cases. . . Answer my question. I mean, is that, I understand you may not consider yourself to be part of the employer, but if you are an employer, does that rule apply if you are joining other circuits? Yes, if you're an employer, then you have to submit your withdrawal liability certificates to arbitration. Okay. One issue here is that a lot of the cases that have, you know, dealt with this issue, it was dealing with, like you said, the concern that the union and maybe one employer will then contract behind closed doors. And I think Judge McNulty actually referenced this as well. You know, they would work behind closed doors, and then the men would lose out. Maybe the pension fund would lose out, because they'd have some agreement where withdrawal liability would not be paid for the pension, and then therefore the pension fund would be hurt. And so a lot of these cases that we see, it's agreements between either the union and the employees or the union and the actual contractors or the pension fund and the contractor. But what we have here is a situation where all three parties are involved. It's a situation where Mr. Valda represented the funds and the union, and the representative for the company was involved in this conversation. And what they discussed and agreed upon was that there would be no withdrawal liability at the end of the deal. So this court found clearly that your claims are subject to mandatory arbitration under the MPPAA. Because it decided that we were an employer, and it decided this because it found that, well, it made a decision at summary judgment that the oral agreement between the parties, even if taken true, would only impact the obligations of our client after. Why isn't that dispositive of the main issue in this case? Well, the reason we feel it's not dispositive is because we're challenging whether or not the court, at summary judgment, should have made a decision about that oral agreement based on what was on the record. The court could have allowed this to move forward to trial, and they could have evaluated the strength of the testimony from the president of Super and the testimony of the representative for the funds and the local. And at that time, the trier of fact could have made a sound decision as to whether and as to what the intent of the parties was when they entered into the letter of summary. You are saying that the oral agreement may be, may supersede the requirement for mandatory arbitration. Yes, Your Honor. Under the MPPAA. Yes, as the courts have defined it, because they've defined what an employer is under the MPPAA as an employer that has an obligation to contribute to a pension fund. And what we're saying here is that there was an oral agreement entered into by all the parties whereby my client was assured in 2007 that they would not have an obligation to pay withdrawal liability at the end of this project. And just so you understand, this is a project that went from 2007 to 2011 when it was shut down for a lack of funding. The entire amount of money and the scope of value of this project for my client was $324,000, I believe. Then in 2017, he receives a note from the fund saying that he owes, I believe, $766,000. That's pretty overwhelming. Yeah. And, you know, this is clearly not the bargain that was entered into between the parties in 2007. No right-minded contractor would enter into this type of agreement. Just looking at this as a practical matter, wouldn't the, I mean, the MPPAA doesn't really create the kind of exception that you're talking about. Wouldn't this be more of a, I notice that you voluntarily dismissed Local 560. But wouldn't the more appropriate action be against Local 560 to seek indemnification for this assessment or I guess sue for fraudulent misrepresentation or something like that? That could be an alternative option. But at this point, we were trying to get our client out of the arbitration that they were being forced into. And the arbitration was being brought by the fund. So we had to address the fund and fight the arbitration being brought by the fund concerned. You had at some point agreed to submit any claims or disagreements in arbitration. Can you say that one more time? You had at some point agreed to arbitrate any claims you have with MPPAA. So we did not agree to arbitrate those claims. It's statutorily required that any withdrawal liability claims must be submitted to mandatory arbitration if you are an employer. And what we're saying here is that we're not. Isn't that your case? That is, yes. All right. So then you would be subject to mandatory arbitration. If we are considered an employer under the MPPAA. But what we're also saying is that at summary judgment, the determination concerning this oil agreement and its implications on whether or not we were employers and had an obligation to pay should have been fleshed out at trial and not decided at summary judgment when there was testimony submitted by both parties concerning, you know, this oil agreement. All right. Okay. All right. So one thing we want to impress upon the court is that this is a situation now of equity also, that we implore the court to consider in this situation. When this law was made, I don't think anybody completely understood that it would apply to contractors that work on a small project for maybe a couple of weeks, a couple of months, maybe a couple of years, and they'd end up having to pay for the mistakes that a union has, maybe we won't call mistakes, but reality has happened. There are less people in the unions.  I have a client that the full scope of work on this project was $300,000. They had promises in 2007 on the ground from the president of the union and a representative of the fund, and now they're paying $700,000. All right. Thank you, counsel. We'll get you on rebuttal. Thank you. And we'll hear from your adversary. Good morning, Your Honors. Good morning. It's a pleasure to be back in the courtroom, I have to tell you that. Yes. My name is David New. I represent the Truckee Employees and New Jersey Welfare Fund slash pension fund. I refer to them, if you may, as the fund. I refer to MPPAA as MEPA. It's a little shorter to say it that way. MEPA broadly provides that all grievances and issues pertaining to withdrawal liability assessments are to be submitted directly to arbitration. But employers. Employers, I'm sorry. Congress's intent was to prevent funds from expending excessive costs and collecting withdrawal liability because it wanted to preserve the assets of the plan to pay what the plans are there for, and that is to pay pension benefits to their participants. MPPAA nowhere defines what an employer is. These other circuits have all reached over to Title I of ERISA to get this technical definition of an employer. Right. Title IV does not address it. Right. I mean, here, J. Super was not, you know, paying the wages directly to these people, was not issuing them the W-2s. It was not what we ordinarily think of as an employer. It was indirectly working for them. There was someone else who was standing in the, you know, the situation of arranging the payroll and the direct employee. I don't know that. That's not necessarily true, Your Honor. They employed people for eight years, paid wages, paid contributions. They paid contributions directly to the fund, signing a remittance report on a monthly basis when they transmitted their payments that has certification on the bottom that the representative of the company would sign saying that they certify that they were paying pursuant to a written agreement with the union obligating to make contributions. They were signing pursuant to a written agreement with the union. But, you know, the W-2s and the pay stubs, were those coming from J. Super? That's not in the record, Your Honor. But I believe it was. 560 doesn't have a hiring call, which we're accustomed to in some of the trades or whatever. These were drivers that they used that were 560 members. Whether or not they were issuing W-2s or 1099s, I don't know. But what I do know is they directly made contributions on behalf of all these 560 members when they were working on the American Dream project. They did that for eight years. And it's conceivable that these gentlemen who were driving these trucks, I assume they're gentlemen, worked at least five years and gained vested benefits from this plan, which has to be paid by the pension fund. This is a pension fund like many other teams of pension funds in the country facing severe financial situations, especially this one is insolvent. Does the record tell us whether they were the direct employers of these men or whether they just arranged via the union for them to do the driving? There's nothing in the record on that. There's nothing in the record that tells us that. There's nothing in the record that says whether they were W-2 employees or 1099 employees. That I know of. Okay. I don't know on a personal matter, but I know it's not in the record. Okay. Now, you relied really heavily on the issue about defining employer under the MIPA, I guess you called it. I'm sorry? What did you call it, MIPA? MEPA. MEPA, okay, great. But your adversary is talking, I think, more about let's look at the contract. Why is that inappropriate for us to look at the contract, what the actual obligations were? And could they raise this alleged oral promise as a defense in a contract matter? Well, first of all, Your Honor, the definition, and we count seven other circuits, is that if the entity had an obligation to contribute and to fund, it's a, quote, unquote, employer for MEPA purposes, any other disputes, and that's what Judge McMulty said, that's what the Second Circuit has said and all the other circuits, that then there's an obligation to submit any other disputes to arbitration. The contract, I don't see where there's a nexus. I don't see in the briefs of the company where there's a nexus made between the definition of what an employer is and this contract that you allege, an oral guarantee, so to speak, from the union president, that there would be no withdrawal liability. I don't know how that makes one not an employer as opposed to when there isn't one. And I don't know what remedy they're actually looking from the court. Are they saying that in the future any entity that has an obligation to contribute because of a written agreement to a pension fund is obligated to pay withdrawal liability and submit any disputes to binding arbitration, but not in those cases where there was an agreement from the union that you would have no withdrawal liability. Well, I mean, if you look at this from their perspective, and they bring up kind of a compelling equitable argument that, hey, we paid in this much, what the total liability is for withdrawal liability dwarfs it, and we were always just a short timer. And that's not an unusual situation in funds that are in this bad of a financial shape, Your Honor. But to answer your question, MEPA doesn't differentiate or say, well, if the enumeration you receive on a project is less than what your withdrawal liability is, you don't pay it. There's certain calculations that are used to assess withdrawal liability, and they were followed here. There's nothing presented by super that says that those weren't followed. Just out of curiosity, in other situations, do contracting parties ask, can you estimate our withdrawal liability if we just execute our contract as written? The statute permits an employer to requisition the fund to calculate its withdrawal liability, and some companies do it on an annual basis. Before you get into the contract, just say, hey, if I'm only making $100,000 and I have to pay $700,000, I'm out. I don't want to be involved in that. Can they do it ahead of time? Do they ask your client, what's our withdrawal liability going to be? Could you give us an estimate? What a lot of them will do is they will make sure that there's no withdrawal liability with the fund. And what's interesting is when contractors sign on with construction locals, there's usually no withdrawal liability because 4203 of ERISA provides for a construction industry exemption. This is a Teamster fund that's never had a construction industry exemption. If the homework that Super did was just talk to a union president on the job site, whether or not they have withdrawal liability, it never reduces it to writing, and it's an agreement that the president of Valner has disputed in the record. It's an affidavit in the record. It's nebulous whether or not this agreement ever happened, and I can't believe that a company who know if he's aware of what a withdrawal liability is doesn't check with the fund, doesn't hire an attorney, doesn't get something in writing that says you're not going to pay any withdrawal liability if you enter into this agreement. We had the same case, Your Honor, the exact same case with the same attorneys, with a company called Gramercy Reckon, had signed the same project labor agreement, signed the same letter of assent, was on the same project, went to file suit in New York instead of New Jersey because it was a New York company, I believe it was the Eastern District, and the Eastern District held that they had to go to arbitration. Same issues were raised. It went to the Second Circuit. The Second Circuit said, look, as long as you have an obligation to contribute to this fund, any other disputes have to go to arbitration, and we went to arbitration in that case, and the only issue that was arbitrary in that case was whether or not this agreement, because they raised the same agreement that was made with President Valentine, whether or not that agreement precluded their obligation to make withdrawal liability payments. Your adversary actually is the one who cited that unpublished Second Circuit case, and we commend him for his candor in bringing that to our attention, but go ahead. Yeah. There's nothing about this. Also, I wanted to say, this so-called alleged oral agreement never appears in the petition. The petition in this case claimed that there was no obligation to contribute and no obligation to pay withdrawal liability for two reasons. One, that the company never signed a full-blown collective bargaining agreement, only signed a project labor agreement through signing a letter of assent. And the project labor agreement, which Judge McNulty found, refers to a collective bargaining agreement of an association in Local 560 that obligates anybody who signs the letter of assent to pay contributions, and that's why they paid contributions, because they signed an agreement that referred to this agreement to refer to that agreement, and also paid all the contribution rates, the wage rates, the contribution rates. They go up every year, and they continue to pay that according to that agreement. That was their first argument. Their second argument was, besides the fact that they didn't have a full-blown collective bargaining agreement, is that they weren't – I'm sorry. I forgot what the other one was, but it has nothing to do with – there was nothing cited in there in the petition about this oral agreement. Judge McNulty dismissed the two other prongs that they argued, and when he got to the argument about the oral agreement, he cited the Pittsburgh MAC case, which is a Third Circuit case, where it was held that the parties can't bargain away the statutory obligation to pay withdrawal liability. And the reason in that case – and the case is not even cited by the company. There's no reply brief that responds to our asserting that Pittsburgh applies here. But in that case, what happened was there was an agreement between the union and the company where they said there would be no – not that there would be no withdrawal liability, but that the union would identify the company if there was a withdrawal liability. We don't have those facts here. And the reason why they said that that was okay, that contract, is because the company was still primarily responsible for that withdrawal liability. Can I ask another question about the record? You said there's nothing in here about whether these are W-2 or 10-9-9 employees. The district court's opinion talks generally about Jay Super as the contractor and there being various subcontracts on the project. Is there anything in the record about whether these drivers we're talking about were employed directly by Jay Super or whether they worked for a subcontractor? There's nothing in the record. Nothing in the record about that. And that's the first of – I've never heard that they worked for anyone else but Jay Super. Jay Super directed their work. Right. Maybe Mr. Lovelace on rebuttal can add if he knows anything about this in the record. Yes. So what they're asking you to do is if this is the agreement they're saying took place, it's an agreement that's not enforceable, it's ineffective, and it's illegal. So the company's asking for the court to make an exception to the contractual obligation standard that the seven other circuits have adopted. They're asking you to make an exception to that. And, Judge Bibas, you had said, you know, your better argument is that this is something that should be handled by the court rather than arbitration. They're maintaining that this takes them out of the employer status, even though they admit in their papers that they had an obligation to contribute to the funds. I don't see what the nexus is. I don't see the argument anywhere in the breeze or where this nexus is between whether or not you're an employer and the fact that there's this oral agreement, so alleged oral agreement with a union that said there would be no withdrawal. How does that not make someone an employer? And that is a dispute that should go to arbitration. It's exactly what Congress intended. Otherwise, don't companies allege other disputes and say, hey, I'm not an employer, even though I made contributions to this fund, but I have this dispute. You know, I was made this promise. In fact, this promise didn't come up until the summary judgment motion. It was never in the petition. It's just this case has been going on for four years, and we're not even at an arbitration. This case would have been over. This is exactly what Congress intended. And as soon as this is established by the court, and that's been the law in the Third Circuit since Flying Tiger, which has got to be 35 years ago, that once it's established that the company is an employer, everything gets shoved off to the arbitrator, including this and any other agreements they may have. What I'm wondering, though, is you don't know whether this was a contract or a subcontractor. You don't know if they were W-2 or 1099. Is it really established that they were an employer? At the summary judgment level, Your Honor, we allege that they were the employer, that they were directly responsible for these employees' contributions. That was in our 56.1 statement. The company failed to respond to that 56.1 statement, nor file their own. But the moving party has to establish that, and yet you say there's no record evidence establishing that. What we have in the record is that they directly made contributions to the fund because of the contribution report they submitted said that they were responsible for paying contributions on behalf of these employees. They were responsible for paying contributions, which is not the same thing as that they directly employed them. Well, in the Korea shipping case, in that case, too, that was a Stephen Dorn company. The Second Circuit has taken that view. Yes. But we haven't yet committed ourselves to taking that view. And that's why we're here, Your Honor. We could take a plain English dictionary understanding, an employer is anyone who employs another to undertake a task, in which case the question would be, is there an employee-employer relationship directly between those two? And that's why it's not enough to tell us that they undertook to pay the money or they didn't undertake it. Now, maybe we'll follow the Second Circuit, but maybe we won't. So that's why I want to know if we follow a more conventional definition, how have you satisfied your summary judgment burden when you tell me there is nothing in the record that speaks to this? And those were the arguments that were made in some of the other circuits by employer and that is having control over the employer and those types of things rather than the obligation to contribute. Right. And you're reaching, these circuits are reaching from the MPPAA over to ERISA Title I, which is kind of an odd thing to be doing. And I think the reason is, Your Honor, is that if the company is the one that signs an agreement obligating them to make contributions, and they're the ones who cause these men to work and therefore acquire pension benefits, vested pension benefits that have to be paid by this fund, why should they be treated any differently when the fund's assets are not sufficient to pay these benefits? Why are they off the hook? But someone who signs a collective bargaining agreement or signs an agreement and they are a traditional definition of employer, they should have to pay withdrawal liability and pay the deficit there is in Scott Freed because he may not have been the direct employer. And I think that's the reason, the rationale for these other courts, circuit courts, to borrow Title I's definition of employer rather than the traditional labor definition. Thank you, Counsel. Thank you, Counsel. Thank you. We'll hear from your adversary. Thanks. Thank you, Judges. I recall the last statement your adversary said. Once it's determined you're an employer, all goes to arbitration. He was very emphatic about that. Why doesn't that pertain to you? That is the common status of the law. However, what we're saying here is that at the summary judgment stage, the lower court erred by making that determination that we were an employer because we did not. You're saying you're not an employer. We're saying we're not an employer because that's a legal definition that's defined by case law right now. It's an actual definition that's been laid out through the case that says if you've had an obligation to contribute to the pension fund, you're an employer. But what we're saying is. You don't employ people that work for the, is it the Meadowlands Project or something like that? I heard the discourse going back and forth about whether or not we were W-2 employees or who controlled payment. I can't speak to that issue exactly at this time. I'd have to consult my client exactly how checks went out, who paid who. So I can't opine on that at the moment. But, you know, what I can say is that at the start of this, and I'm glad Opposing Counsel brought up the fact that there's another similar case that I worked on that deals with the same exact type of situation, with Mr. Vowner in the field making promises to another contractor that they could work on, and in that case it was the Giant Stadium Project, right next door, that they could work on this project, that they wouldn't incur any withdrawal liability at the end, and then eight, nine, ten years later they get a letter, and in that case it was about $600,000. Is your principal a contractor? Yes. Is my client, did you say is my client a contractor? Yes. Or principal. Your client is a contractor. Yes, sir. And hires employees. Yes, it does hire employees, and at this point in time, relevant to the case, they were hiring employees from Local 560, because that's what they were instructed to do to work on the American Dream Project, is my understanding. But were these directly employed by J-Super, or were they employed by subs? Do we know that? That I don't want to opine on exactly. I'm not sure. If eventually the work was kind of managed by subs and direction was by subs, that I'm not exactly sure. But I don't contest the fact that J-Super paid contributions on behalf of these individuals from Local 560, but there was an agreement that was made that said that they wouldn't have this obligation. So if that agreement at trial was fully examined and the trier of fact decided that the verbal agreement was real and that the parties actually came to this, and you know what? It's not so far-fetched because the letter of assent is short, and it is different from the other case. That case involved the job site agreement. This has a letter of assent. So the language is a little different. We're talking about different contracts. But in this one, the letter of assent really does say that this would only apply to the scope of the contract and it would end when the project expired. So my client, who is not an attorney, but is a sophisticated businessman, thought that a conversation with the president of the union, somebody from the board of trustees, and a letter of assent that says that this will end at the scope of the project was covering himself, was the way to handle this type of situation, was the way to protect his company from a bill of $700,000 down the road. What else can you do in that situation? I know opposing counsel would say, well, he should have sat down maybe and asked for all the books and records of the union before signing on the American Dream Project. He should have went through all the financials. But this is why he thought he covered himself with promises, with agreements, and with the letter of assent, and didn't sign that collective bargaining agreement because he didn't want to get roped in to withdraw liability. Any other questions? Anything more, counsel? No, Your Honor. Thank you, counsel. Thank you. We will take this case under advisement. Thank counsel for their excellent briefing and oral arguments today in court and wish you good health and wellness. And we'll ask the court crier to adjourn court for the day. Thank you.